(PRIZE.)

The GEORGE.

A question of collusive capture. The capture pronounced to be collusive, and the property condemned to the United States.

THIS is the same cause which is reported in the first volume of these Reports, p. 408, and which was ordered to farther proof upon the points there stated.

The cause was argued by Mr. *Webster* and Mr. G. *Sullivan*, for the captors, and by the *Attorney-General*, for the United States.

Mr. Justice Johnson delivered the opinion of the court.

This is one of those cases which too often occur in courts exercising admiralty jurisdiction, in which the court is left to decide between the most positive testimony on the one hand, and the most obstinate circumstances on the other.

The privateer Fly had captured the schooner George, and carried her into the province of Maine. But various circumstances having excited a suspicion that the capture was collusive, a claim was filed in behalf of the United States, and she was adjudged to the government, in opposition to the right set up by the captor.

In all the courts through which this case has passed, the most ample opportunities have been given for the production of testimony. But, unfortunately, this indulgence has only served to thicken the difficulties of the case.

We have now before us the most positive depositions of the supercargo and the shippers of the George, (men whose veractity stands unimpeached,) denying, in every point, the collusion, and contradicting, in almost every material point, the evidence upon which the adjudications took place in the courts below. On the other hand, the characters of Thomas and Rodick, who swear to positive confessions on the subject of the fraud, are amply sup-

ported by the most respectable testimony, whilst the veracity of Wasgate and Stanwood, who testify to the same point, stands wholly unimpeached.

It is painful to a court ever to express an opinion that results in an imputation of wilful perjury, and, as much as it is possible in this case, we will put out of view the clashing testimony of individuals, and consider the case upon those facts concerning the truth of which the evidence leaves no doubt.

It is a notorious fact, and is expressly and repeatedly sworn to in this case, that during the restrictive system and the late war, English manufactures, in immense quantities, were accumulated in the small ports on the west coast of Nova Scotia, and it is a melancholy truth, which this court has had but too much cause to know, that many unprincipled individuals were actively engaged in introducing those goods into the United States, under innumerable artifices, and to an immense amount. The protection of the British government was openly given to this intercourse, and there were found but too many in our country who countenanced and encouraged it. Hence this illicit intercourse was actively carried on, and naturally casts a suspicion on such shipments made in that quarter. On the other hand, although an effort has been made to show, that a trade in the same articles was carried on between those provinces and the Havanna, but one instance can be shown of such a shipment. All the witnesses agree, that the exports from St. Johns to the Havanna consisted of fish and lumber. Indeed, from the course of trade at that time, it is notorious that the Havanna

as well as other Spanish ports to the southward, were
crowded with British manufactures, for the same un-
principled trade carried on at Amelia Island.   The
shipment, then, in the first instance, is a suspicious
one, and leads to the opinion that the dry goods were
intended for the United States, whilst the fish and
lumber were to be used only as the cover under
which they were to be introduced.   But this reason-
ing may be consistent with the idea of a destination
to any port of the United States, as well as the
ports in that vicinity with which this privateer ap-
pears to have been connected.   Let us, then, ex-
amine if the George was equipped for a voyage of
any duration.   And here the evidence is irresistible
to show that she was not.   She had no dunnage, or
platform, for the purpose of preserving the goods
from damage by water, and nothing was stowed or
packed in such a manner as to indicate preparation
for a protracted voyage.   Her sails and rigging were
old, worn, and deficient in quantity, and her main-
sail too large both for mast and boom.   Her wood,
and water, and provisions very scanty; and her
crew, before the mast, not more than one half of what
were necessary for a long and a winter's voyage.
Add to this, that her captain is proved to have been
a very young man, scarcely twenty-one years of age,
altogether unknown to the shippers, and engaged
only four days before the vessel's sailing.   It cannot
be believed that so valuable a cargo could have been
destined for so long a voyage with such defective
equipments; no court, upon such evidence, would

1817.
The George.

have hesitated to avoid a policy on either vessel or cargo.

We, therefore, think, that her real destination must have been to some port in the vicinity of that at which her voyage commenced. How, then, was the cargo to be introduced?

Here I regret that it is necessary to notice a part of the testimony of Gregory Vanhorne, which certainly casts a shade upon all the rest of his testimony. The George, it appears, had actually sailed under convoy of the Beaver as far as Etang Harbour. There the vessel lay in a secure port, under the protection of the Martin sloop of war, and at a place occasionally assigned as a place of rendezvous to vessels that were to sail under convoy. Yet Vanhorne swears that he heard the commander of the Martin expressly order the captain of the George to depart for the place where she was captured, an open road, without protection, only fifteen miles from Etang Harbour, and there to wait the indefinite arrival of some unascertained convoying vessel. This cannot be true. For, independently of the fact, which appears to be satisfactorily established, that Long Island Harbour, in the island of Grand Magnan, when this vessel was captured, had never been used as a place of rendezvous for a convoy, it is very clear that such an order would not have been obeyed by a vessel that feared exposure to capture; for it is proved to have been a place often visited by American privateers.

We, therefore, consider the vessel's departure from Etang Harbour to the place where she was

captured as voluntary, and her patient stay at that place as manifesting that she did not fear exposure to American capture. Yet it does not follow necessarily, that it was the Fly privateer that she was waiting for, nor that she expected to be captured at all. The cargo intended for the American market may, by possibility, have been intended to be introduced into the United States, by being transhipped into some smuggling vessel. So far every thing comports perfectly with the innocence of this capture.

But the privateer Fly also draws suspicion upon herself in the very inception of her voyage. We find, what we pronounce absolutely unprecedented, notwithstanding every effort to prove the contrary, that the captain, Dekoven, is sole owner of the privateer, and every man under him, from the lieutenant down, is engaged on wages. In the case o the Washington privateer it was a circumstance of great weight with this court that nine out of fifteen of the ship's company were joint owners, and it was thought improbable that such a transaction, if there was fraud in it, would have been confided to so many witnesses.[b] But here no man but the captain is to participate in the prize money, and he thus presents himself as the most convenient agent possible to be intrusted with such an undertaking. Perhaps this circumstance may give a leaning to the mind of the court in considering the effect which ought to be

[b] Vide ante, p. 169, The Bothnea and Jahnstaff.

given to other evidence in the cause; but if so, it is Dekoven's misfortune, and one which he has himself furnished the cause for.

It then becomes necessary to consider whether the arrival of Captain Dekoven was the object of this vessel in taking the position she did, in the island of Grand-Magnan. And here it is proper to remark that Etang Harbour, lying up the bay of Passamaquoddy, N. W. and by W. of St. Johns, where this vessel took in her cargo, is off the course to Cuba, and a very convenient situation for intelligence with Machias, in the province of Maine, by means of a chain of islands extending across the bay. One of these islands is Moose Island, about five leagues distant from Grand Magnan, and something less from Etang Harbour. Now, the evidence is very satisfactory to prove that the Fly lay, some time in December, at Machias; that during that time Sebor, the lieutenant and brother-in-law of Dekoven, was absent from the vessel. And Jabez Mowry, who resides on Moose Island, swears, that during that time Sebor was on Moose Island, and holding communication with certain notorious smugglers from the states; to one of which, of the name of Toler, from New-York, he had a letter. Again; the pilot who was on board the Fly swears that from all he saw on the occasion of the capture, he concluded it was *amicable;* and Aaron Gale, a witness, resident upon the island of Grand-Magnan, who saw the whole transaction, swears to the same fact, and adds, that after the capture, the captain of the privateer and his prize-master came on shore to

a neighbouring house, where the witness then was, and got something to drink. This looks very little like a consciousness of being among enemies. To this he adds, that he heard a British officer, who was at the time recruiting upon the island, threaten Vanhorne, the supercargo, who, together with all the crew except the supposed captain, were immediately put on shore, to put him in irons for the fraud in thus colluding with the enemy.

I will notice but two more pieces of testimony which the case affords, and which, taken with the rest, we think too strong to be resisted. The first is that of Richard Higgins, who testifies that, on the arrival of the George off the harbour called Frenchman's Bay, or, as he expresses himself, at Mount Desert, he, the deponent, was the first person who boarded her; that Sebor, the lieutenant of the Fly, who was the prize-master, told him where they had captured the George; upon the witness's inquiring what she was loaded with, he replied, fish and lumber. The witness remarked that she floated very light for such a load, upon which Sebor replied he did not know what the cargo consisted of, and that he wanted to get farther to the westward. The witness then told him, distinctly, "that he presumed the capture had been made by some previous understanding, and that, if such were the case, he thought he would be likely to fare better, and undergo a less rigorous scrutiny, if he put into this district, than he would if he went into any of the more western districts, upon which, after consulting with some one of his crew, he went in." This testimony is important in

two views, 1st. The plot here developes itself, and we find the fish and lumber actually resorted to as the means of cloaking the introduction of the British goods. And the resort of Sebor to this deception, (for he must have known it to be such, had it been only from the inspection of the invoice,) shows his privity to the secrets of the machinery. 2dly. Going into the port after the suggestion of Higginson, amounts to a passive acquiescence in the correctness of his suggestions, and an acceptance of the facilities held out to him to induce him to enter that port.

The last and only remaining piece of testimony that we shall notice, is that of Joseph Grindel, of Penobscot, who swears that he was in St. Johns at the time the George was lading; that he was familiarly acquainted with Vanhorne, the supercargo, and that he held a conversation with him, respecting a passage, and the shipment of a hogshead of molasses to the states, and remitting the money to his mother at Penobscot, which, if it be true, (and we have no cause to doubt his veracity,) puts to rest every question relative to the fraudulent design with which this adventure was undertaken. And the same witness further swears, that, after consenting to take his adventure on board, (an adventure that never could have been intended for the Havanna market,) Vanhorne sailed a day or two sooner than he had intimated to the witness. That upon this he complained to Nehemiah Merrit, the shipper, and received from him this notable answer, " He suspected your politics, and was afraid you would betray him."

Upon the whole, we are of opinion that it was a

case of collusive capture, and that the decree below should be affirmed.

Decree affirmed.